**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CARLINDA PETTIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 10078** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Carlinda Pettis seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the case should be reversed or remanded. The Commissioner responded with arguments in support of upholding the decision. After careful review of the record, the Court agrees with Plaintiff that the case must be remanded for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on May 4, 2010 alleging disability since December 5, 2007 based on a "mental condition, suicidal," thyroid problems, and poor vision. (R. 170-172, 185). The Social Security Administration denied her application on August 3, 2010, and again upon reconsideration on December 7, 2010. (R. 115-19, 124-27). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Marlene R. Abrams (the "ALJ") on December 13, 2011. (R. 39). The ALJ heard

testimony from Plaintiff, who was represented by counsel, medical expert Kathleen M. O'Brien, Ph.D., and vocational expert Jill Radke. (*Id.*). Almost 2 years later, on September 27, 2013, the ALJ denied Plaintiff's claim for SSI benefits, finding that she is capable of performing a significant number of jobs available in the national economy. (R. 39-52). The Appeals Council denied Plaintiff's request for review on November 13, 2014, and Plaintiff now seeks judicial review of the ALJ's decision which stands as the final decision of the Commissioner. (R. 29-33).

In support of her request for reversal or remand Plaintiff argues that the ALJ: (1) failed to give Dr. Galligan's opinion the controlling weight it deserved; and (2) did not account for all of her impairments and limitations in making the residual functional capacity ("RFC") assessment. As discussed below, the Court finds that the ALJ's decision to afford Dr. Galligan's opinion only minimal weight is not supported by substantial evidence, and the case must therefore be remanded.

## **BACKGROUND**

Plaintiff was born on June 23, 1963, was 48 years old at the time of her hearing, and 50 at the time of the ALJ's decision. (R. 52, 68). She attended school through the eighth grade, has never been married, and has a son, a daughter and two grandchildren. (R. 68, 267, 297, 315). Though she worked briefly as a cashier and an assembly line employee, she has never held a full-time job or one lasting longer than three months. (R. 90-93).

**A.     Medical History**

Plaintiff's medical records reflect a hospital stay and inpatient treatment for five days in 2007 followed by outpatient treatment for psychiatric conditions and medication management over a course of several years.

### 1.     2007 Hospitalization and Inpatient Treatment

Plaintiff was admitted to the Michael Reese Hospital emergency department on December 4, 2007 after she tried to commit suicide by overdosing on Vicodin, Naproxen, and Ibuprofen.  (R. 249-50, 328).  Plaintiff had been living in the same building as her parents and was being forced to move to a neighborhood "really far" away in order to maintain her eligibility for Section 8 housing.  (R. 328, 356).  According to a Psychiatric Intake Assessment completed on December 5, 2007, Plaintiff received a preliminary diagnosis of major depression, single episode without psychotic behavior, and was assigned a Global Assessment of Functioning ("GAF") score of 50.[1]  (R. 257).  Also on December 5, 2007, the hospital transferred Plaintiff to Madden Mental Health Center ("Madden") for inpatient treatment.  (R. 254, 264).

Plaintiff's initial diagnosis at Madden was depressive disorder, not otherwise specified, polysubstance abuse, and substance-induced mood disorder.  (R. 264).  Her GAF score was 10-20, indicating severe psychopathology.  (R. 264).  Though she

---

[1]     "The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level."  *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. text revision 2000)).  "A GAF between 41 and 50 indicates 'Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'"  *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011).  In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association "abandoned the GAF scale because of 'its conceptual lack of clarity … and questionable psychometrics in routine practice.'"  *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (quoting DSM 16 (5th ed. 2013)).

refused to talk at first, Plaintiff ultimately admitted to depression, anxiety, irritability, hopelessness, helplessness, and difficulties in getting medical treatment. (*Id*). Plaintiff said that she tried to kill herself because she was depressed about being put out of her apartment and because her son was in jail, and she also complained about having flashbacks from when she was a teenager. (R. 265-66, 280).

While Plaintiff was still at Madden, she learned that her father had died suddenly. (R. 264). Plaintiff's family wanted her to come home, and she was discharged on December 10, 2007. (R. 264, 292). The doctor indicated that Plaintiff had "benefitted substantially" from the hospitalization such that she was medically stable and no longer suicidal. (R. 265). The discharge diagnosis was adjustment disorder with depressed mood, and her GAF score was 70. (R. 264).

## 2. 2008

Shortly after her release from Madden, on January 4, 2008, Plaintiff called the Mercy Hospital and Medical Center Mental Health Clinic ("Mercy") to request psychiatric treatment. She was assigned to Robert Galligan, Psy.D., who completed a Mental Health Assessment on January 7, 2008. (291-92). Dr. Galligan diagnosed Plaintiff with major depression, single episode, moderate, and gave her a GAF score of 52.[2] (R. 305). He noted that Plaintiff felt guilty about her father's death, "as if she is to blame," and recommended individual psychotherapy, psychiatric evaluation, and medication monitoring. (R. 293, 305).

---

[2] "[A] GAF between 51 and 60 reflects 'Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Jelinek*, 662 F.3d at 807 n.1 (7th Cir. 2011) (quoting DSM 34 (4th ed. text revision 2000)).

Plaintiff returned to see Dr. Galligan on January 17, 2008 and reported that she had been molested by cousins when she was 6 years old, and then raped by a stranger at gunpoint when she was 18. (R. 302). Dr. Galligan determined that Plaintiff remained depressed and was probably in need of medicine. (*Id*). In that regard, she was scheduled to start seeing a Mercy psychiatrist who appears to be named Dr. Anand on January 21, 2008 for additional therapy and medication management.[3] (R. 302). After missing that appointment, Plaintiff explained to Dr. Galligan during a telephone conversation on February 8, 2008 that she was anxious about leaving her house. Dr. Galligan got her to promise that she would come in on February 21, 2008. (*Id*.).

At that appointment, Plaintiff reported feeling relieved that she had been approved for a new apartment but also worried that she had chosen the wrong place. (R. 299). She said she had always worried about things from her past, present and future, and Dr. Galligan opined that her concentration was "adversely affected by [that] habitual worry." (*Id*.). He planned to continue working with her on "alleviating her tendency to ruminate." (*Id*.). Dr. Anand completed a Psychiatric Evaluation of Plaintiff the same day, finding her to have poor insight and impaired judgment. (R. 308). The doctor diagnosed major depressive disorder, recurrent; assigned Plaintiff a GAF score of 45; and instructed her to start taking 20 milligrams of Prozac. (R. 309).

Plaintiff next saw Dr. Anand on March 20, 2008. She reported that she had run out of medication one week earlier and "need[ed] my pills." (R. 336). Her sleep and appetite were poor at that time and her affect was anxious. Plaintiff told Dr. Anand that

---

[3]     The signature is illegible on all of this doctor's treatment notes, but one of Dr. Galligan's notes indicates that Plaintiff was seeing both him and a "Dr. Anand" during this time period. (R. 302).

she "felt OK" when on the medications, and the doctor instructed her to resume 20 milligrams of Prozac. (*Id.*). Plaintiff did not show up for her appointment with Dr. Galligan on March 24, 2008, but she was "tearful" when she saw him on April 4, 2008. She expressed feelings of guilt about not being with her father when he died, and anger at her son whose prison sentence got extended due to fighting. (R. 301). Plaintiff missed her next scheduled appointment with Dr. Galligan on April 21st but spoke with him by phone on April 22, 2008. Plaintiff told Dr. Galligan that she remained depressed and they discussed ways that she might become more active. (R. 337).

The next day, on April 23, 2008, consultant Harley G. Rubens, M.D., performed a psychiatric examination of Plaintiff for the Bureau of Disability Determination Services ("DDS").[4] (R. 314-16). When asked by Dr. Rubens if she had any "mental, nervous or drug" problems that interfered with her ability to work or function, Plaintiff responded "a mental depression." (R. 314). She reported that she often thought about suicide and the times she was sexually molested, and explained that she blamed herself for her father's death. (*Id.*). Dr. Rubens noted that Plaintiff lived by herself in the same apartment complex as her mother and was able to do her own cooking, cleaning, laundry and grocery shopping. (R. 315). Plaintiff reported no romantic involvements and said that her only friends were family members. On a typical day she sat in her house and watched television, or visited with her mother downstairs. (*Id.*).

Dr. Rubens diagnosed Plaintiff with a history of organic mood disorder and adjustment disorder with mixed anxiety and depression. He found that she had been

---

[4]    Though not part of the record, it appears that Plaintiff sought benefits at some point prior to filing her May 2010 application. Notes from Dr. Galligan indicate that he sent requested chart information to the Social Security Administration in April and August 2008. (R. 301, 337, 341).

functioning "at about a 60 [GAF] over the last year," had not described symptoms of major depression or psychosis, and had not demonstrated any cognitive impairment. (R. 316). He noted, however, that Plaintiff "has always been dependent on her mother, sisters or other family members to take care of her." (*Id*.).

When Plaintiff saw Dr. Galligan again on May 2, 2008, her mood had improved and she seemed relieved to have completed the move to her new apartment. (R. 337). Dr. Galligan talked to her about her "mistrust of people except for a few close family members," and found that she was still experiencing "ups and downs" in her mood. (*Id*.). One week later, on May 9, 2008, Dr. Galligan had what he characterized as a "crisis call" with Plaintiff who was having trouble adjusting to her new apartment and the separation from her family. (R. 338). Plaintiff reported feelings of anxiety and depression that day, but during a follow-up telephone session on May 20, 2008, she told Dr. Galligan that she was feeling better and more adjusted to the apartment. (*Id*.).

Plaintiff returned to Dr. Anand on May 27, 2008 complaining that she was unable to afford her medication. Dr. Anand switched her to Lexapro and gave her some free samples. (R. 339). On June 26, 2008, Plaintiff told Dr. Galligan that she was feeling more comfortable in her new apartment and was not lonely because she regularly visited her family. In Dr. Galligan's view, Plaintiff's "worst fears were dispelled after she adjusted to her move." (*Id*.). At a follow-up appointment on July 14, 2008, Plaintiff told Dr. Galligan that she was stressed by "the prevalence of drugs and gangs around her . . . apartment." (R. 341). She was "trying to cope with the emotional stress of living in a dangerous community," and Dr. Galligan planned to help her develop adaptive

strategies. (*Id.*). The same day, Dr. Anand instructed Plaintiff to continue taking Lexapro and return on September 4. Plaintiff was a no show that day.

### 3. 2009

The next available record is from February 26, 2009, when Dr. Galligan closed Plaintiff's file because she had not been in for treatment in over seven months.[5] (R. 341). At that time, he diagnosed Plaintiff with major depressive disorder, single episode, moderate, and assigned her a GAF score of 58. (*Id.*). Eight months later, on October 29, 2009, Plaintiff once again returned to Dr. Galligan, this time accompanied by a male friend. (R. 319). She said that she had been feeling more depressed and thought she needed to return to treatment. (*Id.*). In particular, Plaintiff was unhappy about her apartment, which she felt was in an unsafe neighborhood, and was feeling isolated from her family. (*Id.*). Dr. Galligan opined that Plaintiff's fear about being in an unsafe area "may be contributing to a general state of paranoia," and scheduled her for a psychiatric evaluation the following week. (*Id*).

Plaintiff started seeing Mercy psychiatrist Robert A. Channon, M.D., on November 4, 2009 for medication management. (R. 323). She was very tearful that day as she recounted her attempted suicide and her guilt over her father's death. (*Id.*). Dr. Channon noted that while Plaintiff "claims she stopped attending clinic because her problems had left her[, a]ctually she acknowledges she leaves her home rarely now, cries easily and does not care if she lives or dies." (*Id.*). Dr. Channon described Plaintiff as alert and forthcoming during the visit, but also stated that she exhibited "some vigilance and fearfulness." (*Id.*). He diagnosed Plaintiff with major depression,

---

[5]     The note is actually dated February 26, 2008, but this appears to be a scrivener's error.

recurrent; instructed her to restart Lexapro; and planned to monitor her for safety and evaluate her for more overt paranoia. (*Id.*).

Plaintiff saw both Dr. Galligan and Dr. Channon on November 25, 2009. (R. 317, 320). During the session with Dr. Channon, Plaintiff was in a "brighter mood" in anticipation of a Thanksgiving feast prepared by her mother. (R. 317). She also recognized the benefit of taking Lexapro and "even talking to someone." (*Id*). At the same time, Plaintiff told Dr. Galligan that she was discouraged by some of her relatives' bad behavior, and he encouraged her to work on developing a positive approach to life. (R. 320). When Plaintiff returned to Dr. Channon on December 30, 2009, she reported that her mood had been "good" and focused on concerns about physical symptoms (weight gain, missed periods) that could be related to her history of thyroid problems. (R. 318).

### 4.    2010

Plaintiff next saw Dr. Channon on April 14, 2010 following an "interval of 3.5 months." (R. 345). She reported a "litany of problems getting carfare or car breaking down," and wanted some medication. She also said that she had been feeling depressed and had cut herself on 4 separate occasions, once even intending to kill herself. (*Id.*). Dr. Channon prescribed Plaintiff Prozac and instructed her to use a discount program at Target. (*Id.*). Shortly thereafter, on April 20, 2010, Plaintiff told Dr. Galligan that she had applied for Medicaid and was upset because of bills she had received from Mercy's finance department. (R. 321). She expressed her desire to continue coming for treatment despite the long commute, and Dr. Galligan scheduled an appointment for May 5. (*Id.*). Three days later, on April 23, 2010, Plaintiff went to see

Dr. Galligan without an appointment to talk about "her disability application." Plaintiff agreed that she would "make every effort to be here for her next appointment with me," and Dr. Galligan noted that she seemed "motivated to make changes in her life." (R. 447).

Plaintiff applied for SSI benefits on May 4, 2010, (R. 170), and then missed her appointment with Dr. Galligan the next day. She did see Dr. Channon on May 26, 2010, however, and reported that she had been unable to fill her prescription due to money problems. Dr. Channon reiterated his instructions to pursue discount programs at Target and Walgreens and gave Plaintiff some free samples of Lexapro to tide her over. (R. 400).

On June 17, 2010, State agency consultant Ana A. Gil, M.D., performed a psychiatric examination of Plaintiff at the request of DDS. (R. 356-60). Plaintiff told Dr. Gil that she had been depressed for the previous three years, recounting her suicide attempt and her father's death. (R. 356). Though she felt better when taking Prozac, she could not afford the medication and was instead getting free samples from Dr. Channon, who she reported seeing every six weeks. Plaintiff admitted that she was also supposed to see Dr. Galligan every two or three weeks but said she did not have "carfare" so had not seen him for a few months. (*Id.*). Plaintiff discussed her move and described feelings of hopelessness, helplessness, decreased energy, lack of motivation and increased social isolation. (R. 356-57). She denied any suicidal ideation but had difficulty concentrating and short-term memory impairment. (R. 357).

With respect to activities of daily living, Plaintiff told Dr. Gil that she could wake up around 7:00 a.m. but usually became somewhat anxious and then paced around

before going back to sleep until 9:00 a.m. (R. 357). Plaintiff's sister helped her with cooking and cleaning, and her daughter helped with laundry and took her grocery shopping. (*Id.*). During the day, Plaintiff napped for 4-5 hours and then was only able to sleep for an hour or 2 at night. (R. 357-58). Aside from watching television, she reported no hobbies or interests, and said she did not have any friends. (R. 358).

On examination, Dr. Gil noted that Plaintiff was 46 but "appeared" to be about "55 years old." (*Id.*). She assessed Plaintiff with "mild psychomotor agitation, a sad, tearful and restricted affect and moderately depressed mood," and found her immediate memory to be impaired. (R. 359). Dr. Gil diagnosed "Major Depression Single Episode Without Psychotic Features – Moderate In Severity" and recommended that she be evaluated to "rule out active thyroid disorder which may be contributing to [Plaintiff's] depressive symptoms …." (R. 360).

In a session with Dr. Channon on July 16, 2010 Plaintiff reported she had not yet been approved for Medicaid. (R. 441). She was in a better mood and had entertained family for July 4th, but her sleep was disturbed by people playing loud music nearby. Dr. Channon maintained her on the same dosage of Lexapro. (*Id.*). Shortly thereafter, on July 27, 2010 Carl Hermsmeyer, Ph.D. completed a Mental Residual Functional Capacity Assessment of Plaintiff at the request of DDS. (R. 370-72). He found her moderately limited in the ability to understand, remember and carry out detailed instructions, and to maintain attention and concentration for extended periods. (R. 370). Plaintiff had no significant limitation in any other areas, including the ability to maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and

to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 370-71). In a Psychiatric Review Technique completed the same day, Dr. Hermsmeyer found that Plaintiff's major depression caused mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence or pace. (R. 377, 384).

Plaintiff saw Dr. Channon on August 27, 2010 for medication management. (R. 398). She was upset because she felt unable to help her daughter who was getting evicted, explaining that she "cannot handle all th[e] stress" and did not want "anyone else in my place." (*Id.*). Plaintiff was also dealing with collection calls from Mercy and appealing the denial of her application for "Public Aid." Dr. Channon increased Plaintiff's dosage of Lexapro to 20 milligrams and instructed her to return in four weeks. (R. 398). When Plaintiff saw Dr. Galligan on September 10, 2010, she was still upset about her daughter's eviction and the threat of losing her public funding. (R. 397). She appeared sullen and distracted and acknowledged an "intensification of depression and anxiety." Dr. Galligan stated that Plaintiff was experiencing a "crisis" and scheduled her for another visit in two weeks. (*Id.*).

The same day, Dr. Galligan completed a Mental Medical Source Statement ("MMS Statement") to assist Plaintiff with her application for disability benefits. (R. 450-55). Dr. Galligan indicated that he had been treating Plaintiff approximately once every 6 months since January 7, 2008, but also said he saw her "very infrequently and so it is difficult to accurately assess her condition." (R. 450). Over the course of that "infrequent therapy and medication monitoring sessions," Plaintiff showed "only transient, moderate improvement," and Dr. Galligan opined that "[i]t seems she remains

depressed & poorly functioning." (*Id.*). He diagnosed major depressive disorder, recurrent, moderate; assigned Plaintiff a GAF score of 53; and identified housing and finance problems as environmental stressors. (*Id.*).

With respect to Plaintiff's signs and symptoms of depression, Dr. Galligan described her as experiencing: anhedonia; decreased energy; blunt or inappropriate affect; feelings of guilt or worthlessness; generalized persistent anxiety; difficulty thinking or concentrating; persistent disturbances of mood or affect; apprehensive expectation; emotional withdrawal or isolation; emotional lability; and sleep disturbance. (R. 451). He found her seriously limited but not precluded from a variety of mental abilities and aptitudes needed for unskilled work, including: remembering work-like procedures; understanding, remembering and carrying out either very short and simple instructions or detailed instructions; maintaining attention for 2 hour segments; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in a routine work setting; and dealing with normal work stress. (R. 452-53).

Dr. Galligan further opined that Plaintiff was unable to meet competitive standards in the following areas: maintaining regular attendance and being punctual within customary tolerances; working in coordination with or proximity to others without being unduly distracted; and completing a normal workday and workweek without interruption from psychologically based symptoms. (*Id.*). At the same time, he stated that Plaintiff was limited but satisfactory in her ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places and

use public transportation. (R. 453). Dr. Galligan estimated that Plaintiff would be absent from work more than 4 days per month due to her impairments, and would have trouble getting to work regularly and remaining at work for a full day. (R. 454). As discussed later, the ALJ gave this opinion only minimal weight, and Plaintiff now challenges this as erroneous.

In her next therapy session with Dr. Galligan on September 24, 2010, Plaintiff appeared to be stable despite having to deal with unidentified fears and problems relating to her daughter. (R. 395). She reported being "hypervigilant in her apartment because she worrie[d] that something bad might happen," and Dr. Galligan noted that the neighborhood seemed to have a lot of crime. Dr. Galligan opined that Plaintiff "seem[ed] to be coping marginally adequately with the aid of medication" but had not "tied into therapy." (*Id.*). During a session with Dr. Channon the same day, Plaintiff admitted to "a certain vigilance, almost ideas of reference." (R. 396). She reported improved sleep after an increase in the Lexapro but said she still "paces and is on-guard." (*Id.*). Dr. Channon instructed Plaintiff to continue taking Lexapro and added Seroquel to her medication regimen. (*Id.*). At a follow-up appointment on October 22, 2010, Plaintiff told Dr. Channon that she was "doing better" and tolerating both medications. (R. 431).

When Plaintiff saw Dr. Channon again on December 10, 2010, she was crying as she recalled her father's death and reiterated that she blamed herself for his passing. (R. 428). Dr. Channon encouraged Plaintiff to monitor herself for "suicidality" and increased her dosage of Seroquel. (*Id*).

### 5. 2011

During her next session with Dr. Channon on January 14, 2011, Plaintiff was in a "better mood" and not "so urgently suicidal," but she admitted to "persistent anxiety/discomfort leaving the house except for absolute necessity." (R. 422). In a prescription pad note dated the same day, Dr. Channon wrote: "Ms. Pettis is treated for Major Depression, recurrent which incapacitates her, and she is unable to work." (R. 394). A couple months later, on March 25, 2011, Plaintiff told Dr. Channon that her mood had been "good for several weeks." (R. 416). Dr. Channon left Plaintiff's medication regimen unchanged and instructed her to return in 4 to 5 weeks. (*Id.*).

Plaintiff saw Dr. Galligan again on April 27, 2011. He described their therapy sessions as "infrequent," explaining that he only saw Plaintiff "on rare occasions, and these opportunities are usually unplanned and when she is her[e] for medication monitoring." (R. 412). From what Dr. Galligan could tell, Plaintiff had been "leading a fairly isolated, minimally functional life." (*Id.*). He characterized Plaintiff's improvement as "modest, and although she is not suffering from a severe depression, it appears that her symptoms have never completely abated." (*Id.*). The "biggest benefit" in Plaintiff's life at that time was the fact that "her living situation and finances have become relatively stable." (*Id*). Dr. Galligan diagnosed Plaintiff with major depressive disorder, recurrent, moderate, with borderline personality disorder traits, and assigned her a GAF score of 54. (R. 413).

Two days later, on April 29, 2011, Plaintiff had another session with Dr. Channon. She reported that her daughter had been giving her the grandchildren to look after to "distract her from depression and [suicidal ideations]." (R. 412). Plaintiff

acknowledged being more depressed recently and was "particularly bothered by the continued drug-dealing right around her home and her mother's possible dementia/paranoia emerging."  At the same time, she admitted that she "'stretched' out her meds over [the] past 2 weeks" for unknown reasons.  (*Id.*).  Dr. Channon told Plaintiff to resume her full dosage of medication and return in four weeks.  (*Id.*).  During that May 27, 2011 appointment, Plaintiff informed Dr. Channon that she was still taking care of her grandchildren, which Dr. Channon viewed as an "indication that [Plaintiff's daughter] thinks she still needs something to occupy her/distract her from depression." (R. 409).  Plaintiff also complained of nightmares after a man came to her door pretending to be from the Chicago Housing Authority.  (*Id.*).

The following month, on June 29, 2011, Plaintiff told Dr. Channon that she had been feeling better since her birthday but was experiencing "ongoing paranoia" and keeping her blinds down and not opening her windows.  (R. 406).  Since Plaintiff said she was unable to afford any out-of-pocket medication expenses, Dr. Channon switched her from Lexapro to Cymbalta and gave her free samples.  (*Id.*).  When Plaintiff returned to see Dr. Channon on September 23, 2011, she admitted to doing "some partying recently with 'bad influences,'" and described her mood as "okay."  At Plaintiff's request, Dr. Channon put her back on Cymbalta and had her continue taking Seroquel.  (R. 465).

### 6.    Post-2011

Plaintiff's hearing before the ALJ was on December 13, 2011.  (R. 39).  There are no treatment records available after 2011, but on July 24, 2013 (approximately two months before the ALJ's September 27, 2013 decision), Plaintiff's counsel submitted a second MMS Statement from Dr. Galligan.  Dr. Galligan stated that he had been seeing

Plaintiff approximately once a month "for the last several months." (R. 474). He again diagnosed major depressive disorder, moderate, recurrent but identified the loss of her mother and sister as environmental stressors instead of housing and finance problems. (*Id.*). As Dr. Galligan explained, Plaintiff "has been coming for sessions on a more regular basis since experiencing the deaths of close relatives." (*Id.*).

Plaintiff's signs and symptoms of depression were largely unchanged from the September 10, 2010 evaluation, though Dr. Galligan added that she was easily distractible and exhibited memory impairment. (R. 475). Dr. Galligan also found Plaintiff unable to meet competitive standards in 6 new areas, including remembering work-like procedures; maintaining attention for 2 hour segments; performing at a consistent pace without an unreasonable number and length of rest periods; dealing with normal work stress; and understanding, remembering and carrying out detailed instructions. (R. 476-77). Dr. Galligan reaffirmed that Plaintiff would be absent from work more than 4 days per month due to her impairments, and would have trouble getting to work regularly and remaining at work for a full day. (R. 478).

**B.    Hearing Testimony**

**1.    Plaintiff's Testimony**

Plaintiff testified at the hearing that she completed the eighth grade and has never held a full-time job because she "can't be around people." (R. 68, 91). She once managed to work on an assembly line with her niece and cousin, but only lasted there three months even with their support. (R. 92-93). Plaintiff became "teary" while speaking of her father's death, and recounted the circumstances surrounding her suicide attempt, the resulting hospital stay, and her subsequent move to a new

apartment far from her family. (R. 69-70, 74, 85). While she has not tried to commit suicide again, she thinks about it. (R. 72).

When Plaintiff gets up in the morning, she locks her doors and "cages" herself in her house. (R. 78). She brushes her teeth, showers, prepares her own meals, and cleans up after herself, then sits in the house watching television. (R. 78-79). Plaintiff has a driver's license but the only places she drives to are her appointments, the store, and her mother's home. (R. 76). She receives food stamps, lives in Section 8 housing, and does not pay any rent or bills since she has no income. (R. 81). Her sisters help her out financially, and she gets free medication samples from her doctor. (R. 81-82). She also has a male friend who knows about her problems and sometimes comes over to her place to talk or goes with her to see her psychiatrist. (R. 94).

Plaintiff testified that when her daughter thinks she is considering suicide, she brings her children over and leaves them overnight, believing that this will stop her from hurting herself. (R. 84). The last time her grandchildren stayed with her was three weeks before the hearing. (R. 85). Though the grandkids "basically" watch television, Plaintiff does make sure they bathe, brush their teeth, change their clothes, and eat. (R. 85-86). Plaintiff does not let the children go outside, and her daughter comes and checks on them and constantly calls "because she knows how I am." (R. 87-88).

### 2. Medical Expert's Testimony

Psychologist Kathleen O'Brien, Ph.D., testified at the hearing as a medical expert (the "ME"). She found that Plaintiff suffers from major depressive disorder, recurrent and moderate, as well as borderline personality disorder features. (R. 96-97). With respect to the borderline personality, the ME explained that it likely does not rise to the

18

level of a "full blown diagnosis" but the "personality tendencies are there." (R. 96). For this reason, the ME opined that Plaintiff can perform a job that does not involve a lot of contact with the public; requires contact with supervisors and peers only 30% of the time; and is restricted to simple, routine, repetitive tasks. (R. 97, 101-102).

In making her assessment the ME determined that when Plaintiff is "attentive" to her medicine and her treatment in general, "her condition improves and she functions better." (R. 99-100). The ME also considered Plaintiff's ability to take care of her 4 and 10 year old grandchildren, opining that since childcare requires a lot of judgment and decision making, it is a "much more complicated task" than the simple, routine jobs she envisions for Plaintiff. (R. 100, 104). The ME admitted, however, that there is no evidence as to "how well" Plaintiff cared for her grandchildren. (*Id.*).

Considering Dr. Galligan's opinion in his September 2010 MMS Statement, the ME stated that the findings were not "substantiated" by Plaintiff's treatment records, which never showed her to be completely unable to function. (R. 102). Specifically, the ME noted that Dr. Galligan described Plaintiff as being "stabilized over time with the aid of the medication," and even stated in April 2011 that she was no longer suffering from severe depression. (*Id.*). In the ME's view, if Dr. Galligan's opinion were correct, Plaintiff "wouldn't be able to go anywhere or do anything without support" and would require "constant supervision and support from others." (*Id.*).

## C. Administrative Law Judge's Decision

The ALJ found that Plaintiff's "major depressive disorder, recurrent, moderate" is a severe impairment, but that it does not alone or in combination with other non-severe impairments meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart

P, Appendix 1.  (R. 41-42).   After reviewing the medical record and testimonial evidence, the ALJ determined that Plaintiff has the RFC to perform a full range of work at all exertional levels, as long as she is limited to: simple, routine and repetitive tasks performed in an environment free of fast paced production requirements and no tandem tasks; simple, work-related decisions with few, if any, workplace changes; and only brief and superficial contact with the general public, coworkers and supervisors.  (R. 43).

In reaching this conclusion, the ALJ accorded minimal weight to Dr. Galligan's opinion in his September 2010 MMS Statement, finding it to be out of date and inconsistent with his treatment notes showing "modest improvement despite infrequent visits."  (R. 50).  At the same time, the ALJ gave great weight to the ME's testimony and to Dr. Hermsmeyer's mental RFC assessment, explaining that both opinions are consistent with the objective medical evidence and Plaintiff's activities of daily living.  (R. 50-51).  As for Plaintiff's testimony, the ALJ found her "not entirely credible" given the "essentially routine and/or conservative" nature of her treatment and her failure to regularly take prescribed medication despite getting free samples and referrals to low cost prescription programs.  (R. 44-45).

Based on these findings, the ALJ accepted the VE's testimony that Plaintiff is capable of performing a significant number of jobs available in the regional economy, including dishwasher (7,453 jobs available), laundry worker (1,258 jobs available), and dining room attendant (8,000 jobs available).  (R. 52).  The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act and is not entitled to benefits.  (*Id.*).

**DISCUSSION**

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by sections 405(g) and 1383(c)(3) of the Social Security Act. *See* 42 U.S.C. § 405(g) and 1383(c)(3). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence…." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013).

The Court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [her] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.      Five-Step Inquiry**

To recover SSI under Title XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.  42 U.S.C. § 1382c(a)(3); *Warren v. Colvin*, No. 14 C 1622, 2015 WL 5081586, at *10 (N.D. Ill. Aug. 27, 2015); *Rapsin v. Astrue*, No. 10 C 318, 2011 WL 3704227, at *5 (N.D. Ill. Aug. 22, 2011).  A person is disabled if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently engaged in substantial gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. § 416.920; *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

**C.      Analysis**

Plaintiff argues that the ALJ's decision must be reversed because she (1) failed to give Dr. Galligan's opinion the controlling weight it deserved; and (2) did not account for all of Plaintiff's impairments and limitations in making the RFC assessment.

**1.      Weight of Treating Physician's Opinion**

Plaintiff claims that the ALJ should have afforded controlling weight to Dr. Galligan's opinion that she would be absent from work more than 4 days per month,

rendering her incapable of full-time employment. (Doc. 17, at 8). A treating source opinion is "entitled to controlling weight … if it is well-supported and not inconsistent with other substantial evidence." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering "'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" *Campbell*, 627 F.3d at 308 (quoting *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)); 20 C.F.R. § 416.927(c).

The ALJ cited three reasons for according Dr. Galligan's September 10, 2010 opinion only minimal and not controlling weight: (1) the "opinion was rendered more than one year before [Plaintiff's] hearing, and about 8 months after her last visit to him"; (2) Plaintiff's visits with Dr. Galligan were "relatively infrequent" but she still showed "modest improvement"; and (3) the opinion was "not consistent with [Dr. Galligan's] own treatment notes and . . . internally inconsistent." (R. 50).

Plaintiff first argues that none of these reasons suffices for refusing to give Dr. Galligan's opinion controlling weight. The Court agrees that the ALJ's discussion on this point is somewhat lacking, but there can be no question that Dr. Galligan's opinion is directly contradicted by several medical opinions of record. Dr. Gil, Dr. Hermsmeyer, and the ME all determined that Plaintiff is capable of a restricted range of full-time employment despite her depression and fears about leaving her home. (R. 370). *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439

F.3d 375, 376 (7th Cir. 2006)) ("[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight."). Since the ALJ provided a lengthy discussion of the State agency opinions and the reasons she gave them great weight, (R. 49-51), the Court finds no reversible error in the ALJ's decision not to treat Dr. Galligan's opinion as controlling in this case.

More troubling are the ALJ's stated explanations for giving Dr. Galligan's opinion only minimal weight. The ALJ first stressed that the opinion was dated "more than one year before the December 2011 hearing and about 8 months after Plaintiff's last visit to him." (R. 50). Of course, the ALJ assigned great weight to an even earlier July 2010 opinion from Dr. Hermsmeyer that was based in large measure on a June 2010 opinion from Dr. Gil. In addition, Dr. Galligan issued a second opinion on July 24, 2013, just two months before the ALJ's April 23, 2013 decision, with similar findings regarding Plaintiff's attendance deficits and functional limitations. (R. 474-79). At that time, Dr. Galligan had been seeing Plaintiff approximately once per month for several months, but the ALJ did not even mention this new assessment.

The ALJ also claimed that Dr. Galligan's own treatment notes reflect that Plaintiff was "showing modest improvement despite infrequent visits." (R. 50). This is not entirely accurate. An April 27, 2011 note from Dr. Galligan does reference modest improvement and infrequent therapy sessions, but it also states: "[f]rom what I can tell, [Plaintiff] has been leading a fairly isolated, minimally functional life . . . , and although she is not suffering from a severe depression, it appears that her symptoms have never completely abated." (R. 412). The ALJ fails to mention these additional observations or

explain why Plaintiff's ability to lead a "minimally functional life" undermines Dr. Galligan's opinion that she is unable to meet the demands of full-time employment.

Moreover, the ALJ ignores other treatment notes that support Dr. Galligan's assessment, particularly his opinion that she would have trouble making it to work. In November 2009, Dr. Channon reported that Plaintiff "leaves her home rarely now," "does not care if she lives or dies," and exhibited some "vigilance and fearfulness." (R. 323). In September 2010, Plaintiff was "experiencing a crisis," "hypervigilant," and coping only "marginally adequately with the aid of medication" (R. 395, 397); in January 2011 she was suffering from "persistent anxiety/discomfort leaving the house except for absolute necessity" (R. 422); and in June 2011 she was experiencing "ongoing paranoia." (R. 406). The ALJ did not address these statements even though it is well-established that "[a]n ALJ may not selectively consider medical reports, especially those of treating physicians." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). *See also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("[B]y cherry-picking [the medical file] to locate a single treatment note that purportedly undermines [the treating doctor's] assessment of [the plaintiff's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness.").

Also problematic is the ALJ's failure to indicate whether she gave Dr. Channon's opinions any weight at all. An ALJ must assign weight to each opinion of record and minimally articulate her reasons for doing so. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); 20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). Indeed, since Dr. Galligan and Dr. Channon are both specialists in psychiatric disorders who examined Plaintiff over a period of years, "the

checklist required the [ALJ] to give great weight to their evidence unless it was seriously flawed." *Bauer*, 532 F.3d at 608. Absent any discussion regarding the weight assigned to Dr. Channon's opinion, this aspect of the ALJ's decision is not supported by substantial evidence.

Looking to the frequency of Plaintiff's treatment, the record establishes that she saw Dr. Galligan for at least six years, from 2008 through 2013, and participated in more than 18 individual therapy sessions with him between 2008 and 2011. (R. 291-292, 299, 301-302, 305, 319-321, 337-339, 341, 350, 395, 397). It is unclear whether this constitutes "relatively infrequent" visits as the ALJ suggests, (R. 50), particularly since Plaintiff also saw Dr. Galligan's colleagues, Dr. Anand and Dr. Channon, a total of 17 times during the same period. (R. 308, 317, 318, 323, 336, 339, 345, 396, 398, 400, 406, 409, 412, 416, 422, 428, 441). *See also Harlston v. Colvin,* No. 14-cv-1606, 2016 WL 772790, at *8 (N.D. Ill. Feb. 29, 2016) (finding that 6 doctor visits in a 13 month period did not equate to "limited" treatment). In addition, there is at least some evidence that Plaintiff had financial problems and fears about leaving her house that may have contributed to the gaps in her treatment and missed appointments. (R. 345, 356) (records from April and June 2010 showing Plaintiff complained about "problems getting carfare or car breaking down" and a lack of "carfare."). At a minimum, the ALJ should have acknowledged these issues and factored them into her assessment of Dr. Galligan's opinion. *Brent v. Astrue*, 879 F. Supp. 2d 941, 949 (N.D. Ill. 2012) (an ALJ "may not rely on lack of treatment without exploring why treatment was infrequent.").

This leaves the ALJ's determination that Dr. Galligan's opinion was "not consistent with his own treatment notes and internally inconsistent." (R. 50). The ALJ

identifies three such alleged inconsistencies. First, the ALJ asserts that Dr. Galligan "specifically noted" in his September 2010 opinion that he "could not accurately assess [Plaintiff's] condition due to her lack of consistent treatment." (R. 50). In fact, Dr. Galligan's note states: "I see this [patient] very infrequently, and so it is *difficult* to accurately assess her condition. It seems she remains depressed & poorly functioning." (R. 450) (emphasis added). Defendant concedes the error but argues that it does not "substantively change" what she characterizes as "Dr. Galligan's point that his assessment of [Plaintiff's] condition was made less precise by her failure to seek regular treatment. (Doc. 24, at 8 n.4). Perhaps, but the ALJ still failed to explain why Dr. Galligan's difficulty assessing Plaintiff's condition was "inconsistent" with his opinion that she is unable to maintain regular attendance and would miss more than 4 days of work per month due to her symptoms.

The ALJ's second alleged inconsistency is that in his September 2010 opinion, Dr. Galligan assessed Plaintiff with a GAF score of 53. In the ALJ's view, this score "suggest[s] only moderately severe symptoms and should not preclude employment." (R. 50). The flaw in this logic is that "[c]ourts have explained again and again that GAF scores do not always reflect a psychiatrist's assessment of the claimant's functional capacity." *Stone v. Colvin*, No. 13 C 5171, 2015 WL 2265793, at *3 (N.D. Ill. May 13, 2015). "'GAF scores are intended to be used to make treatment decisions … not as a measure of the extent of an individual's disability.'" *Id.* (quoting *Martinez v. Astrue*, No. 09 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. March 29, 2010)).[6] As this point is "well-established" in the case law, the ALJ was "obligated to explain why a highly-qualified"

---

[6]     Further, as set forth in footnote 1 above, the American Psychiatric Association abandoned the GAF scale after 2012.

psychologist like Dr. Galligan "could not have assigned a GAF score (relating to treatment decisions) and still have found that [Plaintiff] suffered from serious mental difficulties that could have restricted [her] more fully than the ALJ believed." *Stone*, 2015 WL 2265793, at *3 (psychologist's 75 GAF score assessment was an "improper basis" for discounting his opinion).

Equally unpersuasive is the ALJ's conclusion that Dr. Gilligan's September 24, 2010 note describing Plaintiff as "stable" is inconsistent with his opinion that she suffers from a disabling mental condition. "'[S]table' merely means that Plaintiff's condition is unchanged." *Vacco v. Colvin*, No. 14 C 1139, 2016 WL 738455, at *8 (N.D. Ill. Feb. 25, 2016). "Simply because [Plaintiff] is characterized as 'stable'" does not mean that she is capable of working on a full-time basis. *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014); *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008) (fact that treating physician described a claimant as stable "says nothing about whether plaintiff can work: a person can have a condition that is both 'stable' and disabling at the same time"). Indeed, as noted earlier, the same September 24, 2010 treatment note described Plaintiff as "hypervigilant in her apartment because she worries that something bad might happen," and indicated that she was coping only "marginally adequately with the aid of medication." (R. 395). The ALJ should have at least mentioned these observations, which arguably support Dr. Galligan's opinion that despite being "stable," Plaintiff remains incapable of full-time employment. *Campbell*, 627 F.3d at 306 ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability.").

For all these reasons, the Court finds that the ALJ's decision to assign only minimal weight to Dr. Galligan's opinion is not supported by substantial evidence.

**2.      RFC Assessment**

Since the RFC determination may be affected by any change to the weight given Dr. Galligan's opinion, the ALJ should revisit this issue on remand as appropriate.

## CONCLUSION

For the reasons stated above, Plaintiff's request for remand is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: June 13, 2016

SHEILA FINNEGAN
United States Magistrate Judge